UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRELL LARUE, ) | |
| ) | |
| Plaintiff, ) | Case No. 18-cv-932 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| GHALIAH OBAISI, as Independent Executor ) | |
| of the Estate of DR. SALEH OBAISI, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Terrell LaRue suffered from a hernia while incarcerated at Stateville Correctional Center. He first reported his hernia to the prison medical staff in July 2015. The staff monitored his condition during regular follow-up appointments, and eventually scheduled LaRue for surgery in July 2018.

LaRue filed suit in the meantime, before the surgery took place, taking issue with the speed of the treatment. LaRue alleges that the medical staff waited too long to give him surgery, and thus showed deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

LaRue brings claims against four Defendants: (1) the Estate of Dr. Saleh Obaisi (the prison's former medical director); (2) Wexford Health Sources (the private company responsible for providing medical care at the prison); (3) former Warden Randy Pfister; and (4) current Warden Walter Nicholson.

All four Defendants moved for summary judgment. For the reasons stated below, Defendants' motions are granted in their entirety.

**Background**

I.    **Treatment of Hernias**

This case involves medical treatment for an inguinal hernia, "a defect that forms in the inguinal canal and causes contents of the abdominal cavity to herniate or bulge through this canal." *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 12 (Dckt. No. 87).

The only testimony from a medical professional in the record is from Dr. Masrur, the surgeon at the University of Illinois at Chicago (UIC) who performed LaRue's surgery in July 2018. *See generally* Dr. Masrur Dep. (Dckt. No. 76-5). He has treated hundreds of patients for hernias, and has performed approximately a few dozen hernia repair surgeries in his career. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 11 (Dckt. No. 87).

According to Dr. Masrur, surgery is a common treatment for reducible hernias. *See* Wexford Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 74 (Dckt. No. 90). A hernia is "reducible" when it can be pushed back into the abdominal cavity. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 17 (Dckt. No. 87).

But surgery carries risks, so doctors can opt for a "wait-and-see" approach. *Id.* at ¶ 20. The wait-and-see approach involves monitoring a patient's condition with regular follow-up visits and prescribing pain medication and/or a "hernia belt" to manage symptoms. *Id.* at ¶¶ 20, 23; *see also* Dr. Masrur Dep., at 18:18 – 19:22 (Dckt. No. 76-5) (describing the wait-and-see approach and agreeing that it is a medically accepted standard when treating a manually reducible non-incarcerated hernia). Patients with a more active lifestyle are more likely to experience a hernia that gets worse. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 20 (Dckt. No. 87).

If a hernia becomes too painful, or complications develop, the primary care doctor may refer the patient for surgery. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶¶ 14–16, 20 (Dckt. No. 87). Doctors typically must rely on a patient's subjective account to determine how much pain a hernia is causing. *Id*. at ¶ 18. As a general rule, when a hernia is "reducible" (again, when it can be pushed back into the abdominal cavity), it is less painful than when it's "non-reducible." *Id*. at ¶ 17.

There are different types of hernias. A hernia is "non-incarcerated" when the abdominal wall is not inside the hernia sac. *Id.* at ¶ 13. But sometimes part of the abdominal wall becomes stuck inside the hernia sac – that's called an "incarcerated" hernia. *Id.* at ¶ 14. An incarcerated hernia can lead to a loss of blood flow (and thus oxygen) to the part of the abdominal wall that is caught inside the hernia sac. *Id*. at ¶¶ 14–15. At that point, the incarcerated hernia is "strangulated." *Id.*

Sometimes a hernia requires immediate surgery, but sometimes not. The need for surgery, and the timing of the surgery, depends on the nature and seriousness of the hernia itself. A strangulated hernia (again, with a loss of oxygen to tissue) is considered "emergent," so the patient needs surgery right away. *Id*. at ¶ 16. Incarcerated and non-incarcerated hernias do not require emergency surgery most of the time. *Id.* They typically can be addressed "in an outpatient or [] more scheduled fashion." *Id.*; *see also* Dr. Masrur Dep., at 15:14 – 16:3 (Dckt. No. 76-5).

## II.     LaRue's Hernia Treatment

LaRue first complained about his hernia to prison medical staff in July 2015. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 25 (Dckt. No. 87). On July 24, 2015, LaRue visited a nurse, Lidia Diaz, and informed her that he had a hernia in his inguinal area. *Id*. The

3

nurse conducted a physical examination and noted "a small protuberance" when LaRue "lied down and coughed." *Id*. However, she observed that LaRue was "alert, oriented, had a steady gait, could ambulate without assistance, and was not in any distress." *Id*.

A few weeks later, on August 12, 2015, LaRue visited a Physician Assistant, LaTanya Williams, to discuss his hernia. *Id*. at ¶ 26. LaRue informed Williams that his hernia didn't hurt "all of the time," but "that he want[ed] surgery." *Id*. Williams referred LaRue to the medical clinic to be measured for a scrotal support apparatus and prescribed him Tylenol for his pain. *Id*.

In October 2015, LaRue was transferred to a different prison, the Menard Correctional Center. *Id*. at ¶ 28. When he arrived, he was seen by a nurse, who stated in her exam notes that LaRue "had no complaints, was alert, oriented, had a steady gait, and he was stable." *Id*. LaRue visited the medical staff again in May and June 2016 for unrelated medical issues, and he did not report any issues with his hernia during either visit. *Id*. at ¶¶ 29–30.

On January 19, 2017, LaRue was transferred back to Stateville. *Id*. at ¶ 31. About nine months later, on October 14, 2017, LaRue visited a nurse and complained of pain "in his left, lower quadrant," and complained about cramping and difficulty urinating. *Id*. at ¶ 32. LaRue did not explicitly complain about his hernia during that visit (but he now argues that the symptoms were related to his hernia). *Id*. The nurse scheduled him for an M.D. sick call. *Id*.

On October 17, 2017, LaRue filed a grievance with the prison related to his hernia, stating that he had a "BIG BULGE" in his "left testicol [sic]." *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 23–24 (Dckt. No. 98). On October 27, 2017, Warden Pfister's designee concluded that the grievance was not an emergency. *Id*. at ¶ 25. On October 31, 2017, a grievance counselor reviewed the grievance and also determined that it was not an

4

emergency (so, based on the grievance form, the counselor reviewed the grievance after the Warden's designee). *Id.* at ¶¶ 24–25; *see also* 10/17/17 Grievance (Dckt. No. 84-2, at 4 of 8).

The day after LaRue filed his grievance, he saw Physician Assistant Williams. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 33 (Dckt. No. 87). During that visit, he reported difficulty urinating, constipation, and "a little pain," but was not in "acute distress." *Id.* Williams noted that LaRue's hernia was reducible. She also prescribed Motrin for his pain, and referred him to the prison's medical director, Dr. Obaisi. *Id.*

On November 1, 2017, LaRue saw Dr. Obaisi. *Id.* at ¶ 34. During that visit, LaRue complained about his hernia. *Id.* So Dr. Obaisi decided to send him for more medical care. Specifically, Dr. Obaisi referred LaRue to an outside specialist. *Id.* He made the referral that day. *See* Wexford Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 67 (Dckt. No. 90). Less than a week later, on November 7, Wexford approved that referral. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 35 (Dckt. No. 87).

In the meantime, on November 4, 2017, LaRue filed another grievance about his hernia. *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 26 (Dckt. No. 98). Warden Pfister and a grievance counselor each determined that the grievance wasn't an emergency on November 6 and November 10, respectively. *Id.* at ¶ 27; *see also* 11/4/17 Grievance (Dckt. No. 84-2, at 5–6 of 8).

The prison reviewed the substance of LaRue's grievances on December 14, and it denied them on the ground that "grievant appears to be receiving medical care at this time." *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 28 (Dckt. No. 98); *see also* Response to Grievances (Dckt. No. 84-2, at 3 of 8).

5

On December 16, 2017, LaRue saw a nurse to request an update on when he was going to see a specialist. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 37 (Dckt. No. 87). The nurse informed him that Wexford had approved Dr. Obaisi's request, and that the prison was waiting on an appointment date. *Id*.

On December 23, 2017, Dr. Obaisi passed away. *Id*. at ¶ 38.

On January 18, 2018, LaRue visited Physician Assistant Williams again. *Id*. at ¶ 39. He reported that his constipation was better, but that the Motrin was not very helpful for his pain. *Id*. In response, Williams increased his dosage of Motrin from 400mg to 600mg. *Id*.

On January 30, 2018, LaRue filed this lawsuit. *See* Dckt. No. 1.

On February 14, 2018, LaRue filed another grievance related to his hernia, stating that he was experiencing "EXCRUCIATING" pain. *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 30–31 (Dckt. No. 98). On February 22, the new Warden, Walter Nicholson, through a designee, determined that the grievance was not an emergency. *Id*. at ¶ 32; *see also* Pl.'s Resp. to State Defs.' Rule 56.1 Statement, at ¶¶ 12–13 (Dckt. No. 92).

On February 26, 2018, LaRue visited Physician Assistant Williams again. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 40 (Dckt. No. 87). He informed her that his hernia had "popped out" that morning. *Id*. Williams "reduced" Plaintiff's hernia, that is, pushed it back into his abdomen. *Id.* She directed him to continue wearing his hernia belt, continue taking his medication, and return to sick call in four weeks. *Id*. She also informed him that his surgery consultation was still pending. *Id*.

On March 28, 2018, LaRue returned for a follow-up appointment. *Id*. at ¶ 41. Williams observed "[n]o new changes," and noted that LaRue "was in no acute distress, had a normal

6

gait," and "was not wearing his hernia belt." *Id*. Williams noted that the hernia was still reducible. *Id*.

On May 4, 2018, LaRue saw Williams again. *Id*. at ¶ 43. "Plaintiff had no new complaints at this time, was in no acute distress, and again reported that he was not wearing his hernia belt." *Id*. Again, Williams noted that LaRue's hernia was still reducible. *Id*.

On May 16, 2018, LaRue saw a specialist, Dr. Mario A. Masrur, a physician at UIC. *Id*. at ¶ 45. Dr. Masrur noted that LaRue was "in no distress, had a steady gait," and that his hernia was "still reducible." *Id*. After an exam, Dr. Masrur recommended that LaRue schedule a surgery to repair his hernia. *Id*.

Shortly thereafter, Wexford and Dr. Okezie (a doctor at Stateville) approved the request for surgery. *Id*. at ¶¶ 46–47. On May 25, LaRue saw Dr. Okezie, who informed him that he had been approved for surgery. *Id*. at ¶ 48.

On July 9 and 10, LaRue had two pre-operation appointments. *Id*. at ¶¶ 49–50. The surgery took place on July 12, 2018. *Id*. at ¶ 51. Dr. Masrur performed the surgery, and by all accounts, it appears to have been a success. *Id*. at ¶¶ 51, 53–55.

Five days later, LaRue filed a grievance complaining about pain from his surgery. *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 34 (Dckt. No. 98). Again, the prison reviewed the complaint and determined it was not an emergency, and Warden Nicholson, through a designee, agreed. *Id*. at ¶¶ 35–36. The grievance officer later denied that grievance as moot because LaRue reported that he was "doing well." *See* Grievance Officer's Report (Dckt. No. 92, at 9 of 77).

7

**III.     This Lawsuit**

As mentioned earlier, LaRue filed suit on January 30, 2018, months before the surgery. *See* Dckt. No. 1. Since then, he has amended his complaint twice, adding facts about the surgery and curing pleading deficiencies. *See* Dckt. Nos. 11, 48. The operative Second Amended Complaint includes claims against four Defendants under the Eighth Amendment (Counts I–IV), plus a negligence claim against Warden Pfister (Count V). *See generally* Second Amended Complaint (Dckt. No. 48).

Chief Judge Castillo, this Court's predecessor before reassignment, dismissed the negligence claim against Warden Pfister with prejudice. *See* 9/18/19 Order (Dckt. No. 54). So, only the claims under the Eighth Amendment remain.

All four Defendants moved for summary judgment. *See generally* Wexford Defs.' Mtn. for Summ. J. (Dckt. No. 74); State Defs.' Mtn. for Summ. J. (Dckt. No. 85). They basically argue that LaRue has not come forward with evidence that they were deliberately indifferent to his medical needs.

**Legal Standard**

A district court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex*, 477 U.S. at 322–23; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Discussion

There are two pending motions for summary judgment. The Estate of Dr. Obaisi and Wexford filed the first motion (together), and the two Wardens filed the other. The Court will address the claims against the Defendants in that order.

**I.     The Estate of Dr. Obaisi**

The claim against the Estate of Dr. Obaisi is about the timing of the surgery. LaRue alleges that Dr. Obaisi violated his Eighth Amendment rights by not scheduling him for hernia surgery soon enough, and by not providing him with adequate care during a three-year period. *See* Second Am. Cplt., at ¶ 32 (Dckt. No. 48) (alleging that Dr. Obaisi "disregarded, for approximately three years, Plaintiff's suffering by failing to provide the very medical treatment that would alleviate Plaintiff's pain"); *id.* at ¶ 33 (alleging that Dr. Obaisi "den[ied] Plaintiff's medical care for approximately three years").

To establish a claim under the Eighth Amendment, a plaintiff must offer evidence of "1) an objectively serious medical condition; and 2) an official's deliberate indifference to that

condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). LaRue has not come forward with sufficient evidence to support a jury verdict in his favor.

There's no doubt that LaRue satisfies prong one, the objective prong. The evidence in the record shows that LaRue suffered from a hernia since at least 2015, and that the hernia caused him some amount of pain. The Seventh Circuit has repeatedly held that hernias, and chronic pain, can constitute objectively serious medical conditions. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (collecting cases).

The question is whether LaRue satisfies prong two, the subjective prong. An Eighth Amendment claim requires evidence that the doctor acted with "a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "They must know of the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also consciously disregard that risk/need so as to inflict cruel and unusual punishment upon the prisoner." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

A plaintiff can show that a doctor acted with deliberate indifference if the treatment was "such a substantial departure from accepted professional judgment, practice or standards . . . that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). In other words, a plaintiff establishes deliberate indifference by showing that "no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

Negligence is not enough. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify

common law torts."). "In the Eighth Amendment context, medical professionals receive a great deal of deference in their treatment decisions." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 519 (7th Cir. 2019).

Out of the gate, there is a disagreement about how many times Dr. Obaisi treated LaRue. LaRue testified that he saw Dr. Obaisi "a few times telling him about my issue." *See* LaRue Dep., at 20:23-24 (Dckt. No. 76-1). But there isn't much in the record about those visits. LaRue offered the following summary at deposition: "[T]he first couple of times he said it was nothing. Wait until you are in more pain or it get[s] worse[]." *Id.* at 20:24 – 21:2; *see also* Pl.'s Rule 56.1(b)(3)(B) Statement of Additional Facts, at ¶ 66 (Dckt. No. 87).

Defendants respond that the medical records show only one appointment with Dr. Obaisi, and that it took place on November 1, 2017. *See* Wexford Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 66 (Dckt. No. 90) ("Plaintiff has not produced any supplemental medical evidence or records demonstrating additional encounters with Dr. Obaisi."). But testimony is evidence, even if there is no documentary back-up. Rejecting testimony because it lacks documentary support is a credibility determination, which the Court can't do at the summary judgment stage. And in any event, the reasonable inferences flow in favor of LaRue as the non-movant.

So, for now, the Court accepts that Dr. Obaisi evaluated LaRue on more than one occasion. LaRue testified that he saw Dr. Obaisi more than once, so the Court accepts it as true. But it doesn't help LaRue. There's almost nothing in the record about those earlier visits. And there is nothing about them that could support a finding of deliberate indifference.

There is more evidence in the record about Dr. Obaisi's examination of LaRue on November 1, 2017. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 34 (Dckt. No.

11

87). By that point, LaRue had already received pain medication and a hernia belt. *Id.* at ¶¶ 26–27, 33. He received a prescription for Tylenol in August 2015, a hernia belt in October 2015, and Motrin in October 2017. *Id.*

In their Rule 56.1 statements, the parties did not include many details about what, exactly, Dr. Obaisi observed during his exam of LaRue on November 1, 2017. In response to the Wexford Defendants' Rule 56.1 statement, LaRue included one sentence about Dr. Obaisi's notes, stating that they show that "Plaintiff has had the hernia for more than 6 years and it becomes incarcerated." *Id.* at ¶ 35. But that's it.

The Court took a look at the notes themselves, and they're difficult to read. *See* 11/1/17 Offender Outpatient Progress Notes (Dckt. No. 76-3, at 15 of 32). They appear to include phrases such as "6 year," "becomes incarcerated," "often painful," "belt not helping," "reducible today," and "episode of incarceration." *Id.*[1] That reading is consistent with the next page in the record (which is typewritten). *See* 11/7/17 Memo (Dckt. No. 76-3, at 16 of 32) (referring to a "patient with large L inguinal hernia with episodes of incarceration," and adding "[b]elt not helping").

For present purposes, the most important thing is how Dr. Obaisi responded to what he observed. Based on the exam, Dr. Obaisi made a referral for LaRue to see a specialist. *See* Pl.'s

---

[1] The Court took a look at the notes, but does not have to consider facts that are in the exhibits but are not in the Rule 56.1 statements. The Local Rules require parties to put the material facts in the Rule 56.1 statements. *See* Local Rule 56.1(a), (d). District courts have no obligation to go on a "treasure hunt," sifting for nuggets in a stream of exhibits, looking for facts not found in the Rule 56.1 statements. *See BI3, Inc. v. Hamor*, 2011 WL 1231156, at *2 (N.D. Ill. 2011); *see also Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011) (noting that it "is certainly within a district court's prerogative" to decline to consider "any facts that were not contained in the parties' Rule 56.1 statements"); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("[F]acts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material . . . ."); *Williams v. Chicago Transit Auth.*, 2019 WL 1057390, at *4 (N.D. Ill. 2019) (holding that facts "not set forth in the manner required by Local Rule 56.1" are "disregarded"); *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664–67 (N.D. Ill. 2015) (collecting cases).

Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 34 (Dckt. No. 87). Seven weeks later, Dr. Obaisi passed away. *Id.* at ¶ 38.

LaRue has come forward with no evidence of deliberate indifference stemming from that medical exam. Nothing in the record could support a finding that Dr. Obaisi showed deliberate indifference when he referred LaRue for more medical treatment.

The undisputed record shows the opposite. Dr. Obaisi evaluated LaRue and referred him to an outside specialist. He didn't deny care – he referred LaRue for *more* care. If anything, sending LaRue to see a specialist is the opposite of deliberate indifference. Dr. Obaisi sent LaRue to someone who could help him.

Timing can matter when it comes to medical procedures. The Seventh Circuit has held that delaying treatment may constitute deliberate indifference if such delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).

But here, LaRue provided no evidence that Dr. Obaisi had any reason to believe that LaRue needed immediate surgery or needed to see a specialist right away. For example, there is no evidence that LaRue was experiencing "severe[]" pain that required immediate treatment. *Id.* There is no evidence that the hernia was strangulated and required emergency attention. Indeed, the only medical evidence in the record indicates that monitoring a hernia like LaRue's is well within the bounds of accepted medical practice. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶ 20 (Dckt. No. 87).

And even then, the delay here was modest. Dr. Obaisi saw LaRue on November 1, 2017, and referred him to a specialist. *Id.* at ¶ 34. Wexford approved Dr. Obaisi's referral on November 7, 2017. *Id.* at ¶ 35. That's six days later.

It is true that the surgery did not take place until July 2018. But there is no evidence in the record that Dr. Obaisi was to blame for the delay. Indeed, Dr. Obaisi passed away in December 2017, the month after he made the referral. *Id.* at ¶ 38. There is no evidence that he dragged his heels, or could have sped things along before he passed away. And again, there is no evidence that the delay was medically inappropriate.

At most, LaRue claims that he should have had surgery sooner, but standing alone, that is not enough. There's no evidence that the modest delay exacerbated the hernia or caused pain unnecessarily. Every patient wants treatment sooner rather than later, but waiting is not a constitutional violation absent deliberate indifference. And here, LaRue offers no such evidence.

The Seventh Circuit recently considered similar claims in another case involving the treatment of a prisoner's hernia. *See Johnson v. Dominguez*, 2021 WL 3123756 (7th Cir. July 23, 2021). There, as here, an inmate claimed that the prison medical staff's treatment of his hernia amounted to deliberate indifference because he did not receive surgery as quickly as he had wanted. *Id.* at *1.

The Seventh Circuit explained that the plaintiff received "over-the-counter pain medication and abdominal binders to manage his symptoms" instead of getting surgery. *Id.* The Seventh Circuit found that medical decision reasonable, and explained that "Johnson's ultimate disagreement with defendants' course of treatment provides no basis to support defendants' deliberate indifference." *Id.* at *5. "Johnson received treatment for his hernia – just not the surgery that he desired." *Id.* The physicians addressed the hernia through pain medicine and

14

abdominal binders, so "each defendant exercised their professional judgment in responding to Johnson's hernia." *Id.* at *5–6. The decision by the medical team to "continue[] with non-surgical treatment" did not amount to a significant delay that could support a deliberate indifference claim. *Id.*

This case is on all fours with *Johnson*. LaRue received regular care from the prison medical staff. They exercised their professional judgment by treating him conservatively at first, managing his hernia with medication and supports. Eventually, Dr. Obaisi referred LaRue to a specialist, and his hernia ultimately required surgery. The delay between LaRue's initial complaints and ultimate surgery was not unnecessarily prolonged, and Dr. Obaisi provided reasonable care in the interim.

The Estate of Dr. Obaisi's motion for summary judgment is granted.

## II. Wexford

Next, the Court addresses Wexford's motion for summary judgment. Wexford is "a private corporation that has contracted to provide essential government services – in this case, health care for prisoners." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Therefore, the *Monell* standard applies, so Wexford "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id*.

However, it is unnecessary to determine whether LaRue has established the requisite causation, because the Court concludes that he has not established an underlying constitutional violation. Again, to establish a claim under the Eighth Amendment, a plaintiff must offer evidence that a prison official was deliberately indifferent to an objectively serious medical condition. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

Here, there is no evidence that any Wexford employee – including any of the nurses who saw him, Physician Assistant Williams, or Dr. Obaisi – treated LaRue in a manner that was "such a substantial departure from accepted professional judgment, practice or standards . . . that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). And no Wexford policy or custom caused constitutionally inadequate treatment, because LaRue's treatment was reasonable.

The only medical testimony in the record is from Dr. Masrur. He testified that there is no need to schedule emergency surgery for a hernia, unless it becomes strangulated. *See* Dr. Masrur Dep., at 15:14 – 16:3, 18:18 – 19:22, 44:22 – 45:1 (Dckt. No. 76-5); *see also id.* at 44:14-21, 54:13-22, 70:24 – 71:7 (confirming that LaRue's hernia was reducible and not incarcerated during his pre-surgical exam in May 2018).[2] When a hernia is not strangulated, a doctor can prescribe pain medication and a hernia belt to manage symptoms, and schedule surgery for some time in the future as necessary. *Id.*

There is no evidence in the record that LaRue's hernia ever became strangulated. So there is no evidence that LaRue ever suffered from a medical condition that required immediate surgery.

Dr. Masrur did acknowledge that a hernia belt could pose dangers (depending on the state of the hernia itself). *Id.* at 22:3 – 23:23. But there's no evidence in the record that LaRue's belt posed any dangers.

---

[2] Though Dr. Obaisi noted that LaRue had experienced "episodes of incarceration" in November 2017, *see* 11/7/17 Memo (Dckt. No. 76-3, at 15 of 32), no facts presented suggest that LaRue's hernia became incarcerated and not reducible during any follow-up visit between November 2017 and May 2018. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶¶ 40–41, 43, 45 (Dckt. No. 87).

So, Dr. Masrur testified that doctors can take a "wait-and-see" approach, depending on the state of the hernia. And that's exactly what happened here. The medical staff provided regular follow-up appointments, prescribed pain medication and a hernia belt, and eventually referred LaRue to an outside specialist for surgery. *See* Pl.'s Resp. to Wexford Defs.' Rule 56.1 Statement, at ¶¶ 25–27, 33–35, 45 (Dckt. No. 87). The medical staff cared for LaRue, time and time again.

LaRue might have wanted surgery sooner, but there is no evidence in the record demonstrating that immediate surgery was medically necessary, or that waiting was a departure from standard medical practice. They took a "wait-and-see" approach, and when they saw a need for surgery, he got it.

Wexford's motion for summary judgment is granted.

### III. Wardens Pfister and Nicholson

Finally, the Court addresses the motion for summary judgment by Wardens Pfister and Nicholson. LaRue's claims are about the grievances that he submitted in the fall of 2017 and the winter of 2018, and about the letters that LaRue sent to Warden Pfister.

These claims fail for the same reason that his claim against Wexford fails: there was no underlying constitutional violation. *See Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016) ("To succeed on their § 1983 claim, plaintiffs must prove (1) the deprivation of a right secured by the Constitution or federal law[.]").

Even if there was an underlying constitutional violation, his claim would still fail. Liability under section 1983 depends on personal involvement in the violation. *See Delapaz v. Richardson*, 634 F.3d 987, 881 (7th Cir. 2011). Involvement in the grievance process, standing alone, is insufficient to give rise to personal liability. *See Gevas v. Mitchell*, 492 F. App'x 654,

17

660 (7th Cir. 2012) ("Gevas alleges no personal involvement by the warden outside of the grievance process, and for that reason his third amended complaint, just like the previous iterations, fails to state a claim against the warden."); *Owens v. Godinez*, 860 F.3d 434, 438 (7th Cir. 2017) (explaining that the mishandling of "grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim") (internal citation and quotation marks omitted); *Burks v. Raemisch*, 555 F.3d 592, 595–96 (7th Cir. 2009); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Daval v. Zahtz*, 2021 WL 2072127, at *9 (N.D. Ill. 2021) ("In *Gevas v. Mitchell*, the Seventh Circuit explained being involved in the grievance process alone is insufficient to establish personal involvement[.]"); *Hemphill v. Obaisi*, 2019 WL 4345360, at *5 (N.D. Ill. 2019) (finding no violation where defendants' "only involvement in Hemphill's case was related to the grievance process" and there was no evidence that defendants "were personally involved in his medical treatment or any alleged delay"); *Hilliard v. Godinez*, 2015 WL 800238, at *3 (S.D. Ill. 2015).

LaRue claims that he sent letters to Warden Pfister about his condition. *See* Pl.'s Rule 56.1(b)(3)(B) Statement of Additional Facts, at ¶ 29 (Dckt. No. 92).[3] Defendants respond that they have no record of receiving any such letters, and that LaRue has not come forward with copies. They argue that his testimony lacks documentary support. *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 98).

---

[3] Plaintiff filed two Statements of Additional Facts. They appear at the end of his responses to Defendants' Statements of Facts, instead of appearing as freestanding docket entries. In particular, Docket No. 87 is LaRue's Response to the Statement of Facts filed by the Estate of Dr. Obaisi and by Wexford. LaRue's Statement of Additional Facts begins on page 17, at paragraph 63. *See* Pl.'s Rule 56.1(b)(3)(B) Statement of Additional Facts, at ¶¶ 63–74 (Dckt. No. 87). Docket No. 92 is LaRue's Response to the Statement of Facts filed by the two Wardens. LaRue's Statement of Additional Facts begins on page 4, at paragraph 16. *See* Pl.'s Rule 56.1(b)(3)(B) Statement of Additional Facts, at ¶¶ 16–38 (Dckt. No. 92).

Maybe so, but it makes no difference. Maybe there's no *documentary* evidence, but there is evidence that LaRue sent those letters, because he testified that he did. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) ("There is certainly nothing wrong with Payne's deposition testimony on its face. The summary judgment rule itself contemplates that parties may submit deposition testimony as evidence for purposes of determining whether a genuine issue of material fact exists."); *see also* Fed. R. Civ. P. 56(c)(1)(A) (allowing the non-movant to respond to a motion by relying on "depositions"). Testimony without documentary support is still testimony, and testimony is evidence.

Defendants argue that his testimony was "self-serving." *See* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 98). But self-serving evidence is still evidence. *See, e.g.*, *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (citation omitted); *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried – or at least tried to bury – the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'"); *Payne*, 337 F.3d at 771–72. It would shock no one to learn that a witness was self-serving. People tend to be self-serving, and their testimony does too.

The problem is not the absence of the letters in the record. The problem is that LaRue could not remember anything about their content during his deposition. *See* LaRue Dep., at 66:4 – 67:10 (Dckt. No. 84-1); *see also* State Defs.' Resp. to Pl.'s Statement of Additional Facts, at

19

¶ 29 (Dckt. No. 98). When asked what was in the letters, LaRue testified: "I can't remember off the top of my head." *See* LaRue Dep., at 66:15-19.

There is a bigger problem, too. Even if the letters complained about the delay in surgery, they would not save the day. There is no evidence that the doctors acted with deliberate indifference. So complaining to the Warden about the treatment by the doctors can't give rise to a claim. A complaint about non-actionable conduct is not, in and of itself, actionable. Without an underlying claim against the doctors, there is no claim against the Wardens. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (concluding that warden did not act with deliberate indifference because he reasonably relied on the expertise of medical professionals); *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920–21 (N.D. Ill. 2002) (dismissing prison administrators from plaintiff's suit because "except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals").

## Conclusion

For the reasons stated above, Defendants' motions for summary judgment are hereby granted on all claims.

Date: August 2, 2021

Steven C. Seeger
United States District Judge